## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| TONY L. MITCHELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case. No.: 7:13-cv-01708-SGC |
| MERCEDES-BENZ U.S. | ) | |
| INTERNATIONAL, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION

Plaintiff Tony Mitchell brings this action against defendants Mercedes-Benz U.S. International, Inc. ("Mercedes"), and TW Fitting NA, LLC ("TWF"), alleging race discrimination and retaliation under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act and asserting a state-law claim for intentional interference with contractual and business relationships against Mercedes. Defendants, pursuant to Fed. R. Civ. P. 56, have moved for summary judgment on all of Mitchell's claims. This court has jurisdiction under 28 U.S.C. §§ 636(c), 1331, and 1367. For the reasons stated below, defendants' motions are due to be granted.

### SUMMARY OF UNDISPUTED FACTS[1]

Mitchell, an African American, was employed by Mercedes from 1997 to 2008. (Doc. 27-2 at 15:22-16:7). He began as a team member/operator but was later promoted to a team leader position. (Doc. 27-2 at 34:2-5). In 2008, Mercedes investigated Mitchell for misconduct, resulting in his demotion to team member and eventual termination. (Doc. 24-2 at 9, 11). Mitchell filed a

---

[1]To the extent factual inferences are drawn, they are drawn in favor of Mitchell, the non-movant.

charge of discrimination with the EEOC and a lawsuit against Mercedes, alleging his demotion and termination were racially discriminatory. (Docs. 24-2 at 10, 24-5). The suit was settled on August 10, 2010. (Doc. 24-6).

After leaving Mercedes, Mitchell applied for several other jobs. (Doc. 27-2 at 356:12-13). Mitchell claims he was offered employment with four of these businesses, but each offer was rescinded because Mercedes spoke of him negatively when contacted for a reference. (Doc. 27-2 at 107:18-108:10, 171:6-172:6). Mitchell interviewed with the first of these companies, Brose, in 2012. (Doc. 27-2 at 171:15-16). According to Mitchell, Brose offered him a job as a Production Supervisor with a set salary, contingent on a background and reference check.  (Doc. 27-2 at 171:1-9). He heard nothing from Brose until he received a rejection letter approximately a week later.  (Doc. 27-2 at 171:17-172:6). According to Brose, it did not contact any of Mitchell's former employers. (Doc. 24-10 at 2).

Mitchell applied for a position with Faurecia in August 2012, through Melissa Preston at Cornerstone Recruitment Group.  (Doc. 27-2 at 184:21-185:5, 195:19-23). After the interview, Preston told Mitchell that Faurecia had offered him a position. (Doc. 27-2 at 200:20-201:2). Subsequently, a Faurecia employee emailed Archie Craft, Vice President of Human Resources and Administration at Mercedes, requesting information on Mitchell. Craft replied, "This individual used to be a Team Leader for us he has a file three inches deep and is not eligible for rehire." (Doc. 24-13). Preston, after speaking with Faurecia, informed Mitchell he would not be hired because of negative references from Mercedes and Johnson Controls, a company for which Mitchell has never worked.  (Doc. 27-2 at 90:3-6, 200:20-21). Craft avers that, at the time of the email, he had no knowledge of Mitchell's EEOC charge or lawsuit against Mercedes and that the information

2

contained in the email is true. (Doc. 24-4).

Mitchell interviewed with Nissan in August 2012. (Doc. 24-2 at 93). According to Mitchell, he was offered a position as a Production Supervisor during the interview.  (Doc. 27-2 at 204:15-20, 210:17-19). One of Mitchell's interviewers, Tom Jones, expressed his desire to get in touch with Patrick Schwind, a former manager of Mitchell's at Mercedes who had been transferred to China. (Doc. 27-2 at 209:19-210:1).  After the interview, Jones emailed Mitchell to request Schwind's contact information.  (Doc. 27-2 at 208:9-18).  Later, when Mitchell attempted to complete the required online assessment, he found himself locked out of the system, and Nissan made no further contact regarding the position.  (Doc. 27-2 at 206:1-8, 19-22).

Mitchell applied for a position with Altec in late 2012. (Doc. 24-11 at 2). On November 6, 2012, Altec formally offered Mitchell a supervisor position, contingent on a background check. (Doc. 39-1). Altec contacted Mercedes to conduct the reference check and spoke with Donna Merrill from Mercedes's human resources department.  (Doc. 27-2 at 224:10-13).  According to Mercedes and Altec, Merrill simply provided Altec with Mitchell's job title and dates of employment. (Docs. 24-2 at 100, 24-9). According to Mitchell, however, Merrill first told Altec that Mitchell was only an operator, not a team leader, making Mitchell appear to have lied on his resume. Mitchell contacted Merrill to clarify with Altec that he had been a team leader, but by this time Altec was no longer interested in Mitchell, and he was not hired. (Doc. 27-2 at 225:1-228:7). Merrill avers that she has no knowledge of any EEOC charge or lawsuit filed by Mitchell against Mercedes. (Doc. 24-9).

Around December 2012, Mitchell had Terri Johnson, a friend for whom he had done some work, contact Mercedes and request a reference determine whether Mercedes was providing negative

3

Case 7:13-cv-01708-SGC   Document 44   Filed 03/24/15   Page 4 of 19


references about him. (Doc. 24-12 at 58:5-17). Johnson did not intend to actually employ Mitchell. (Doc. 24-12 at 60:7-10). Johnson claims to have spoken to Barbara in the human resources department at Mercedes, who told Johnson that Mitchell was not eligible for rehire, had gotten into some trouble, and was not reliable, dependable, or dedicated to Mercedes. (Docs. 24-12 at 62:7-11, 39-1 at 11). Mercedes claims no team member named Barbara worked in their human resources department in December 2012. (Doc. 24-9 at 2).

Mitchell began working for defendant TWF, a Mercedes supplier, as a Production Manager on May 2, 2013. (Doc. 24-2 at 41). As part of his duties, Mitchell frequently made purchases for TWF using the company credit card. (Doc. 27-2 at 279:19-23). The procedure for use of the company credit card is as follows: the employee fills out a company charge request, listing the purposes for use of the card. (Doc. 27-2 at 282:17-19). The request must be approved and signed by Craig Human, the plant manager. (Doc. 27-2 at 284:13-15). The employee then signs out the credit card, receives it, and uses it for the authorized purposes. (Doc. 27-2 at 281:6-7). When the employee returns to TWF, he gives the card back, signs it back in, and turns in all receipts for purchases made using the card. (Doc. 27-2 at 281:7-9). Failure to follow this policy could subject the employee to discipline, including immediate termination of employment. (Doc. 24-2 at 120).

Mitchell requested he be able to use the card on June 28, 2013 to buy supplies at Lowe's or Wal-Mart needed for the upcoming plant shutdown. (Docs. 24-2 at 116, 27-2 at 287:2-6). Human approved and signed the request, Mitchell received the card from TWF's accountant, and Mitchell and two employees left the plant. (Docs. 24-2 at 116, 27-2 at 285:6-17, 295:1-2). The group drove the company van because of the amount of supplies needed, but the van had trouble, lengthening the trip. (Doc. 27-2 at 288:23-289:4). Once they arrived at Lowe's, they gathered the needed supplies

but had to wait for the paint to be stirred.  (Doc. 27-2 at 291:5-8). While waiting, they went outside to attempt to start the van. After fixing more problems with the van, Mitchell realized the group had missed lunch, so he offered to pay for lunch at a nearby Ryan's Steakhouse using the company credit card.  (Doc. 27-2 at 292:1-5). They did so, and Mitchell charged $29.36 to the credit card. (Doc. 24-2 at 118).

Around this time, from approximately the last week of June to the first week of July, Mercedes employees visited TWF because mechanical problems at TWF had been causing downtime, affecting Mercedes.  (Doc. 27-2 at 314-15). Mitchell recognized two of the Mercedes employees, Mike Capps and Rocky Harrelson, as former coworkers.  (Doc. 27-2 at 310:20-22). In the course of conversation, Capps asked Mitchell how his lawsuit against Mercedes was going. (Doc. 27-2 at 311:20-21). Mitchell told him it was settled.  (Doc. 27-2 at 311:23). While the Mercedes employees were at the plant, they spent some time speaking privately with Human in his office.  (Doc. 27-2 at 316:14-16).

Mitchell's employment with TWF was terminated on July 8, 2013, purportedly for use of the company credit card for unauthorized, personal purchases. (Doc. 24-2 at 122). Mitchell claims he was actually fired because of his race and because of pressure exerted by Mercedes on TWF to fire him in retaliation for his previously filed EEOC charge and lawsuit against Mercedes. (Doc. 27-2 at 309:14-19). According to Mitchell, Human, who is white, also used the company credit card for personal purposes but was not fired. (Docs. 27-2 at 305:19-23; 41-1). Capps and Harrelson executed verbatim affidavits averring they have no knowledge of any EEOC charge or suit filed by Mitchell alleging violations of his civil rights and that they did not speak to anyone at TWF about Mitchell. (Docs. 24-15, 24-16).

5

Mitchell filed a charge of discrimination with the EEOC against Mercedes on September 7, 2012, alleging retaliation based on the negative job references. (Doc. 1-1 at 2). He received notice of his right to sue on August 7, 2013. (Doc. 1-1 at 3). He filed separate charges of discrimination against Mercedes and TWF on July 23, 2013, alleging retaliation based on his termination from TWF. (Doc. 24-2 at 45-46). Mitchell filed suit in this court on September 13, 2013, alleging five causes of action: two claims against TWF under 42 U.S.C. § 1981 for race discrimination and retaliation, two claims against Mercedes under 42 U.S.C. § 1981 and Title VII for retaliation, and one claim against Mercedes under Alabama law for intentional interference with contractual and business relationships. (Doc. 1). The defendants moved for summary judgment on all counts. (Docs. 22, 25).

## CONCLUSIONS OF LAW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must "examine the evidence in the light most favorable to the non-moving party," drawing all inferences in favor of such party. *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000). "[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam) (quoting *Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

6

**A. Count I - § 1981 Race Discrimination Against TWF**

In Count I, Mitchell alleges TWF unlawfully discriminated against him because of his race under 42 U.S.C. § 1981 by terminating his employment.[2] "The *McDonnell Douglas* scheme for the allocation of burdens and the order of presentation of proof . . . applies in § 1981 cases involving discriminatory treatment in employment situations." *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1060 (11th Cir. 1994).

> Under *McDonnell Douglas*, the initial burden rests on the plaintiff to establish, by a preponderance of the evidence, a prima facie case of discrimination. Once the plaintiff has set out a prima facie case, a presumption of discrimination arises. The intermediate burden of production then shifts to the employer to articulate a legitimate, non-discriminatory explanation for not hiring him. This intermediate burden is "exceedingly light." The employer need only offer admissible evidence sufficient to raise a genuine issue of fact as to whether it had a legitimate reason for not hiring the plaintiff.
> If an employer succeeds in carrying its intermediate burden of production, the *McDonnell Douglas* framework, with its presumptions and burdens, drops out of the case, and the trier of fact proceeds to decide the ultimate issue in the case: whether plaintiff has proven that the employer intentionally discriminated against him because of his race.

*Id.* at 1060-61 (internal citations omitted).[3]

"To establish a prima facie case for disparate treatment, [Mitchell] must show that '(1) [he] is a member of a protected class; (2) [he] was subjected to adverse employment action; (3) [his] employer treated similarly situated [white] employees more favorably; and (4) [he] was qualified to do the job.'" *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008) (quoting *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000)). TWF concedes Mitchell is a member of

---

[2]Because the same analytical framework and standards apply to claims brought under § 1981 and Title VII, the court will cite authority regarding these statutes interchangeably. *See Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (reciting identical standards for claims brought under Title VII and § 1981).

[3]The same framework applies to Mitchell's retaliation claims under § 1981 and Title VII. *See Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999).

a protected class (a racial minority), that he was subjected to an adverse employment action (termination), and that he was qualified to do his job. TWF only argues Mitchell cannot establish any similarly situated white employees were treated more favorably than him. "'In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.'" *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) (quoting *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir. 1998)). "In order to satisfy the similar offenses prong, the comparator's misconduct must be nearly identical to the plaintiff's in order 'to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'" *Id.* (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999)).

Mitchell only points to Craig Human, the white plant director at TWF, as a comparator. According to Mitchell's testimony, taken as true, Human often used the company credit card to purchase food for team members. (Docs. 27-2 at 305:19-23, 41-1 at 4-25). Mitchell also presents a receipt for a rental car, purchased by Human for his wife with the company credit card. (Doc. 41-1 at 2). This evidence, however, does not show nearly identical misconduct between Human and Mitchell. While mere differences in job titles do not prevent comparator status, *see Lathem v. Dep't of Children and Youth Serv.*, 172 F.3d 786, 793 (11th Cir. 1999), "they can matter. This is because the relevant inquiry is whether the employer subjected differently ranked employees to the same or different employment policies." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir. 2011). Mitchell's termination was purportedly for unauthorized, personal use of the company credit card. Human, on the other hand, is responsible for approving all charges, even charges he himself

8

makes. (Doc. 27-2 at 306:20-23). If Human decides to use the card, that use cannot, by definition, be unauthorized. Any misconduct by Human, then, is not nearly identical to Mitchell's misconduct. Mitchell attempts to avoid this finding by claiming he and Human were subject to the same rules governing use of the card (Doc. 27-2 at 306:16-19), but that contention is not supported by the evidence because Human, not Mitchell, is responsible for authorizing all use of the card. Therefore, Human is not similarly situated to Mitchell.

Although the lack of a comparator does not necessarily doom Mitchell's claim, "[i]f a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate *where no other evidence of discrimination is present*." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir. 2004) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)) (emphasis in original). Mitchell presents no other evidence against TWF demonstrating an intent to discriminate on the basis of race—all of Mitchell's other allegations against TWF regard their succumbing to pressure from Mercedes to fire him out of a retaliatory motive. Therefore, Mitchell has failed to establish a prima facie case of race discrimination under § 1981, and Count I will be dismissed.

## B. Count II - § 1981 Retaliation Against TWF

"To establish a claim of retaliation under Title VII or section 1981, a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events." *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008). TWF only challenges the third element, that there was a causal connection between Mitchell's protected activity (his EEOC charge and suit against Mercedes) and his termination by TWF. To show a causal connection, "the plaintiff must generally show that the

decision maker was aware of the protected conduct at the time of the adverse employment action." *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). Mitchell attempts to meet this showing via circumstantial evidence. According to Mitchell, Mercedes employees were present at TWF in the days leading up to and during TWF's plant shutdown in July of 2013. (Doc. 27-2 at 309:20-310:5). Two of the Mercedes employees, Capps and Harrelson, were former coworkers of Mitchell's, and the three engaged in conversation. (Doc. 27-2 at 311:18-312:6). During the conversation,  Capps asked Mitchell how his lawsuit against Mercedes was going, to which Mitchell responded that it was settled. (Doc. 27-2 at 311:18-312:2). Later on, Capps, Harrelson, and other Mercedes employees spoke with Human privately. (Doc. 27-2 at 316:14-18). Mitchell was fired shortly after the shutdown. (Doc. 27-2 at 315:6-11).

A defendant's awareness of a plaintiff's protected activity "may be established by circumstantial evidence," *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993), but the plaintiff must "show a defendant's awareness with more evidence than mere curious timing coupled with speculative theories." *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997). These two cases are instructive. In *Goldsmith*, the plaintiff informed an employee of the defendant of her intention to file an EEOC charge. The employee urged her not to do so and told the plaintiff that the employee would speak to the defendant's decisionmaker. The employee actually did speak to the decisionmaker, who called plaintiff to his office immediately and told plaintiff that her desired position had been filled. Plaintiff was abruptly transferred three weeks later. The court found this circumstantial evidence to be sufficient. *Goldsmith*, 996 F.2d at 1163. In *Raney*, the only evidence the plaintiff possessed was "an assertion based on a hunch that [an employee of the defendant] informed [a decisionmaker for the defendant] of Raney's plan to file charges with the

10

EEOC." 120 F.3d at 1198. The court found this insufficient, stating that "[s]ummary judgment cannot be avoided . . . based on hunches unsupported with significant probative evidence." *Id.*

This case is much more similar to *Raney* than to *Goldsmith*. Neither Capps, Harrelson, nor anyone else at Mercedes told Mitchell they would inform TWF of Mitchell's charge and lawsuit against Mercedes. In fact, while the undersigned accepts Mitchell's testimony Capps and Harrelson were aware of Mitchell's suit against Mercedes, the two aver they did not communicate with TWF about Mitchell. (Docs. 24-15, 24-16). As in *Raney*, Mitchell's claim is based only on "mere curious timing coupled with speculative theories." *Id.* at 1197. Therefore, Mitchell has not set forth substantial evidence to show that anyone at TWF was aware of his protected activity, so he has failed to show a causal connection, and his prima facie case fails. Accordingly, Count II will be dismissed.

## C. Counts III & IV - Retaliation Against Mercedes

In Counts III and IV, Mitchell brings claims of retaliation against Mercedes under Title VII and § 1981, respectively, based on two distinct types of conduct by Mercedes. In both counts, Mitchell claims Mercedes retaliated against him by providing negative employment references when contacted by Mitchell's prospective employers. In Count IV, Mitchell also alleges Mercedes, once it discovered Mitchell was employed by TWF, pressured TWF into terminating him. Each of these acts will be discussed in turn.

### 1. Negative Employment References

Mitchell alleges that, on five separate occasions, Mercedes provided negative references about Mitchell in retaliation for his filing an EEOC charge and lawsuit against Mercedes. Mercedes challenges Mitchell's ability to satisfy the second and third prongs of his prima facie case.

11

### a. Adverse Employment Action

First, Mercedes argues Mitchell cannot show Mercedes took an adverse employment action against him. An employment action qualifies as adverse if the action "'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 174 (2011) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). The Eleventh Circuit has not decided when an employment reference qualifies as an adverse action. Mercedes cites non-binding authority for the proposition that an employment reference must be false, not merely negative, to be actionable. *See, e.g.*, *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 178-79 (2d Cir. 2005) ("[A] reasonable jury, after hearing the defendant's evidence to the contrary, could find that Yost's false statement negatively affected Jute's chances of securing employment."); *Syzmanski v. County of Cook*, 468 F.3d 1027, 1029 (7th Cir. 2006) ("And 'adverse' in this setting has to mean, employing an objective standard, the dissemination of false reference information that a prospective employer would view as material to its hiring decision."). Other courts have found a reference to be adverse so long as it is negative, even if the information provided is not false. *See, e.g.*, *Brooks v. City of San Mateo*, 229 F.3d 917, (9th Cir. 2000) ("Among those employment decisions that can constitute an adverse employment action are . . . dissemination of a negative employment reference . . . ."); *Hillig v. Rumsfeld*, 381 F.3d 1028, 1033 (10th Cir. 2004) (finding negative employment references to be actionable so long as they have more than a *de minimis* impact on future job opportunities); *Chapman v. Western Express, Inc.*, No. 10-675-WS-C, 2011 WL 780594, *2 n.3 (S.D. Ala. Feb. 28, 2011) ("[F]ederal courts around the country have recognized the viability of discrimination claims predicated on a former employer's furnishing of false *or* negative employment references.") (emphasis added).

12

The undersigned finds that a negative employment reference, even if providing only true information, can qualify as an adverse employment action because a true reference could serve to dissuade a reasonable employee from pursuing a protected activity just as much as a false one. Contrary to Mercedes's assertion, it is not illogical to hold true references actionable.  Even true references could harbor retaliatory intent, as an employer could volunteer more negative information than requested or provide an unsolicited negative reference. Further, this holding only concerns one element of the prima facie case, not a finding of liability.  Retaliatory intent must still be shown.

Mitchell argues that Mercedes provided five negative references. The first was to Brose in 2012, but Mitchell only possesses circumstantial evidence to show a negative review took place. According to Mitchell, Brose offered him a job contingent on a reference check, but Mitchell did not hear from Brose until he received a rejection letter approximately ten days after the interview. (Doc. 27-2 at 171-72). Brose states it did not speak to any former employers concerning Mitchell. (Doc. 24-10 at 2). Mitchell's evidence as to Brose is insufficient to survive summary judgment. Mitchell simply provides no basis for the court to determine Mercedes provided a negative reference to Brose, much less the contents of or intent behind any such reference. Therefore, the alleged reference given to Brose is not actionable.

The second reference, given to Faurecia in August 2012, is plainly actionable. After Mitchell claims to have been offered a job, a Faurecia employee emailed Archie Craft, Vice President of Human Resources and Administration at Mercedes, requesting information on Mitchell. Craft replied, "This individual used to be a Team Leader for us he has a file three inches deep and is not eligible for rehire." (Doc. 24-13). Craft's comments about Mitchell's disciplinary record and eligibility for rehire reflect negatively on Mitchell, so the claim will proceed as to this reference.

13

The third reference was to Nissan, also given in August 2012. Mitchell's assertion that a reference occurred is based only on circumstantial evidence, but such evidence is stronger as to Nissan than as to Brose. During Mitchell's interview, one of the interviewers, Tom Jones, expressed his desire to get in touch with Patrick Schwind, a former manager of Mitchell's at Mercedes who had been transferred to China.  (Doc. 27-2 at 209:19-210:1). After the interview, Jones emailed Mitchell to request Schwind's contact information. (Doc. 27-2 at 208:9-18). After this, when Mitchell attempted to complete the required online assessment, he found himself locked out of the system, and Nissan made no further contact regarding the position.  (Doc. 27-2 at 206:1-8, 19-22). While the details of this potential reference are not known, the circumstantial evidence present is sufficient to allow an inference of a negative reference, so the claim will proceed.

The fourth reference was given to Altec in late 2012. Altec offered Mitchell a position, contingent on a background check. (Doc. 39-1 at 14-15). Altec then contacted Mercedes to conduct the reference check and spoke with Donna Merrill from Mercedes's human resources department. (Doc. 27-2 at 224:10-13). According to Mercedes and Altec, Merrill simply provided Altec with Mitchell's job title and dates of employment. (Docs. 24-2 at 100, 24-9). According to Mitchell, however, Merrill first told Altec that Mitchell was only an operator, not a team leader, making Mitchell appear to have lied on his resume. Mitchell called Merrill to clarify with Altec that he had been a team leader, but by this time Altec was no longer interested in Mitchell, and he was not hired. (Doc. 27-2 at 225:1-228:7). While this mix-up could have merely been the result of an honest mistake, the reference is sufficient to qualify as an adverse employment action.

Finally, Mitchell had Terri Johnson, a friend for whom he had done some work, contact Mercedes and request a reference to determine whether Mercedes was providing negative references

about him. (Doc. 24-12 at 58:5-17). Johnson claims to have spoken to Barbara in the human resources department at Mercedes, who told Johnson that Mitchell was not eligible for rehire, had gotten into some trouble, and was not reliable, dependable, or dedicated to Mercedes. (Docs. 24-12 at 62:7-11, 39-1 at 11). Even though no employment relationship existed or was intended between Mitchell and Johnson, this reference constitutes an adverse employment action. While the lack of actual harm to Mitchell by the reference would factor into a damages analysis, it does not alter the fact that Mercedes gave a negative review of Mitchell to Johnson, whom Mercedes likely thought to be an actual employer. Therefore, Mitchell's claim will proceed as to this reference.

### b. Causal Connection

Mercedes also challenges Mitchell's ability to show a causal connection between his protected activity (the EEOC charge and lawsuit against Mercedes) and the negative references, giving three reasons in support of the challenge. First, Mercedes argues no causal connection exists because the prospective employers all chose not to hire Mitchell for legitimate reasons, so the references did not cause Mitchell not to be hired. This argument is misguided. The causal connection prong requires a connection between Mitchell's protected activity—his EEOC charge and lawsuit against Mercedes—and the adverse employment action—the negative job references. The causal connection between Mercedes' actions and the actions of the other potential employers is irrelevant.

Second, Mercedes argues Mitchell cannot rely on temporal proximity to establish causation. While Mercedes is correct that temporal proximity alone is insufficient in this instance, since Mitchell's lawsuit ended approximately two years before any of the negative references occurred (Doc. 24-6), the contention is irrelevant because Mitchell does not seek to establish causation by

15

temporal proximity. Rather, Mitchell seeks to establish a causal connection by demonstrating "that an employer knew of a protected activity, and a series of adverse employment actions commenced thereafter." *Jiles v. United Parcel Serv., Inc.*, 360 Fed. App'x 61, 66 (11th Cir. 2010).

Finally, Mercedes argues that none of the involved employees had any knowledge of Mitchell's EEOC charge and lawsuit. As stated above, to show a causal connection "the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Brungart*, 231 F.3d at 799. Mitchell claims the negative references came from Donna Merrill and Barbara, Mercedes's human resources representatives, from Archie Craft, Mercedes's Vice President of Human Resources and Administration, and from Patrick Schwind, a former manager of Mitchell's at Mercedes. Merrill avers she has no knowledge of any EEOC charge or lawsuit filed by Mitchell and that no one named Barbara worked in Mercedes's human resources department at the time of Terri Johnson's call. (Doc. 24-9). Craft also avers that, at the time of the email, he had no knowledge of Mitchell's charge or suit. (Doc. 24-4). Mitchell's only response is to argue any assertion that Craft, as Vice President of Human Resources, was unaware of Mitchell's charge and lawsuit "strains credulity." (Doc. 38 at 16). Mitchell presents no evidence to the contrary regarding Craft or any of the other persons he alleges provided negative references, and the bare circumstantial evidence here fails to create a genuine issue of material fact. Therefore, Mitchell has failed to establish a causal connection, and Count III will be dismissed, as will Count IV as far as it relates to the negative employment references.

### 2. Alleged Pressure Placed on TWF

In Count IV, Mitchell claims Mercedes retaliated against him by pressuring TWF, a Mercedes supplier, to terminate Mitchell's employment. Mercedes challenges Mitchell's ability to

satisfy the second and third elements of his prima facie case. The undersigned finds that Mitchell has failed to present evidence of any adverse employment action taken by Mercedes. Mitchell alleges Mercedes employees, namely Capps and Harrelson, exerted pressure on TWF to terminate Mitchell's employment. After Capps asked Mitchell how his lawsuit against Mercedes was going, the Mercedes employees spoke with Human in his office, and Mitchell was fired a few days after the Mercedes employees left. Capps and Harrelson, however, have averred they did not speak to anyone at TWF about Mitchell. (Docs. 24-15, 24-16). Just as in Count II, Mitchell's reliance on this circumstantial evidence is insufficient to demonstrate that Capps, Harrelson, or anyone at Mercedes actually exerted pressure on TWF to terminate Mitchell.  Mitchell's claim amounts only to "mere curious timing coupled with speculative theories." *Raney*, 120 F.3d at 1197. Accordingly, Mitchell cannot make out a prima facie case, and Count IV as related to this theory will be dismissed.

### D. Count V - Intentional Interference With Contractual and Business Relationships Against Mercedes

Finally, Mitchell brings a claim against Mercedes under Alabama law for intentional interference with contractual or business relationships. "[T]he elements of the tort are (1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damages." *White Sands Group, L.L.C. v. PRS II, LLC*, 32 So. 3d 5, 14 (Ala. 2009). While Mercedes challenges Mitchell's ability to show four of the five requirements, the undersigned need only consider the fourth: that Mercedes intentionally interfered with Mitchell's employment with TWF and potential employment with other companies. Whether conduct rises to the level of intentional interference

17

depends, in part, on whether the conduct was justified.[4] *Id.* at 12. Whether conduct is justified depends on a balancing of seven factors: "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties." *Id.* at 13 (internal quotations omitted). "The nature of the actor's conduct is a chief factor in determining whether the conduct is improper or not, despite its harm to the other person." *Id.*

Considering these factors, the undersigned finds that Mercedes did not intentionally interfere with Mitchell's relationships. Mitchell has only presented substantial evidence that Mercedes gave negative references to Altec, Faurecia, and Terri Johnson. But Mitchell has failed to show that any of these references were untruthful or motivated by a desire to retaliate. Further, Mitchell has not shown any actual pressure exerted by Mercedes on TWF to terminate Mitchell's employment. The only acts supported by the evidence are Mercedes's truthful, negative references given to Altec, Faurecia, and Johnson. Because of this, the first, second, and fifth factors weigh heavily in favor of Mercedes. Mercedes only provided truthful references on request, without any retaliatory motive present. While the references were negative, societal interests favor employers being allowed to offer truthful, negative opinions about employees when other potential employers request references, so that employers may give and receive correct information when determining whom to employ without fear of legal action. Therefore, Count V will be dismissed.

---

[4]Whether justification is considered as an aspect of this prima facie element or as an affirmative defense, the analysis remains the same.

**CONCLUSION**

For the reasons stated above, the motions for summary judgment filed by Mercedes (Doc.

22) and TWF (Doc. 25) will be granted. A separate final judgment will be entered.

**DONE** this 24th day of March, 2015.


_____
STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE